

# THE ATTORNEY GENERAL
## OF TEXAS

GROVER SELLERS        AUSTIN 11, TEXAS

XXXXXXXXXXXXXXXXXXXXXXXxxxxx
ATTORNEY GENERAL

Honorable J. O. Ward
County Attorney
Hutchinson County
Borger, Texas

         Opinion No. 0-6806
         Re: Authority of Borger Independent
             School District to issue part of
             bonds already voted before can-
             cellation of grant by Federal
             Works Agency.

Dear Sir:

       Your letter of September 6, 1945, to this department reads as follows:

       "The Borger Independent School District located in Borger, Hutchinson County, Texas, due to a rapid increase in population and in order to provide adequate school facilities, called a special election for the purpose of voting a bond issue to provide these facilities. Through negotiation with the Federal Works Agency a grant was authorized to the District of $250,000 provided the District would vote bonds in the amount of $475,000. The bonds were voted, issued and approved by the Attorney General. After this was done and before any bonds were sold, the school district purchased land and employed architects and had the necessary architectual and engineering work done. There was expended approximately $25,000.00 for property, architectual and engineering work.

       "After VE Day and before any bonds were sold, the Federal Works Agency cancelled the grant to the School District of $250,000. The Board of Trustees of the School District has decided not to proceed with the work of constructing the additional facilities at this time

for the reason that without the $250,000 grant,
the proceeds of the balance of the bonds will
be inadequate; therefore, the additional facil-
ities will not be provided at this time.

"The $25,000 spent for property and archi-
tectual and engineering work cannot be paid out
of the current maintenance funds, and the Board
of Trustees wants to know whether or not they
may legally sell enough of the bonds to pay this
$25,000.

"I will thank you for your opinion as to
whether or not they may legally do this."

On September 26th, we advised you by letter that
neither this department nor that of the Comptroller had any
record of such bonds referred to in your letter.

On September 28th you advised us by letter that you
were misinformed about said bonds having been issued.  You
further stated in said letter as follows:

". . . Before these bonds could be printed and
submitted to the Attorney General for approval, and
sold, the Federal Works Agency cancelled a grant of
$250,000 that had been authorized previous to the
calling of the election.  When this grant was can-
celled the Board of Trustees realized that the
$475,000 would be insufficient to provide the ne-
cessary buildings and equipment to meet the needs
of the district and it will be necessary to call
an election and submit to the voters the proposi-
tion of voting additional bonds and this will
necessarily entail considerable delay.

"What the Board of Trustees want to know is
this:  May they issue and sell enough of the
$475,000 bond issue previously voted to pay for
property, engineering and architectual work al-
ready contracted for, or will it be necessary to
call another bond election for the specific purpose
of voting bonds to pay the obligations already con-
tracted.

"For your information, I am advised by the school

district that the Federal Works Agency has agreed
to pay for one-third of the expenses already con-
tracted in connection with purchasing property and
securing the necessary engineering and architectual
work, plans and specifications."

Replying to our request of October 5th, you have fur-
nished us with copies of (1) Petition for School Bond Election;
(2) Order of the Board of Trustees, dated June 12, 1945, call-
ing such election for June 22, 1945; and (3) Order of July 20,
1945, Declaring Result of said Bond Election.

It appears from said election order that no reference
was made therein concerning a grant from the Federal Works
Agency. It further appears from your communications that said
Federal Agency grant, authorized to said school district, was
conditioned that said district would vote bonds in the amount
of $475,000, which was done. We are furnished no facts or
information showing that said bonds were voted on condition
that such Federal grant would be authorized. We therefore
assume that no such condition attached to such bonds. If we
are correct in this assumption, we know of no reason why bonds
of the voted issue cannot now be issued in total or partial
amounts, from which funds may be realized to provide the facil-
ities for which they were voted. The foregoing conclusion
is conditioned, of course, on the legality of said bond issue.
The record of same has not yet been received by this depart-
ment.

If we are in error in assuming that no conditions
were attached to said bonds, as hereinbefore stated, a different
conclusion would result.

In this department's opinion No. O-2088, approved
May 1, 1940, we held as follows:

". . . The authorities seem to hold that the
approval by the electors of the proposed bond issue
with whatever terms and conditions that the govern-
ing body imposes thereon previous to the election,
creates a status analogous to a contractual relation.
In construing a similar order passed by a com-
missioners' court prior to a county-wide bond elec-
tion, the Supreme Court of Texas in the case of Black
et al v. Strength et al, 246 S.W. 79, said:

     "'The order would not have been made
save with a view to its being relied
on by the voters.  With the bond issue
authorized by votes cast in reliance on
the order, as must be assumed, it could
not be arbitrarily ignored or repudiated
without involving the perpetration of
fraud or its equivalent on the voters.

     "'Under these circumstances, the order
was, in effect, a contract with the people,
and good faith required that the contract
be kept.'

    "Any other rule would tend to undermine public
confidence in the acts of public officers.  See also
Golden Gate Bridge and Highway District v. Filmer,
21 Pac. (2d) 112; Perry v. Los Angeles, 203 Pac. 992. . . ."

    A copy of said opinion in full is hereto attached for
your information.

    However, regardless of the foregoing conclusions, we
are of the definite opinion that none of said voted bonds may
now be issued and sold for the purpose of paying for property,
engineering and architectual work already contracted for.
Neither can additional bonds be voted for said purpose.  These
conclusions are amply supported by the following authorities:

    In the case of Board of Trustees of Alpine Independent
School District, et al v. Jacob, 170 S.W. 795, (Civ.App., San
Antonio), Appellee Jacob, as assignee of Phelps, sued appellant
for $400 alleged to be due for plans of a schoolhouse prepared
by Phelps at instance of appellant.  Appellant answered and de-
nied its authority to make the contract sued upon.  It fur-
ther alleged that Phelps knew that the money to build the
schoolhouse was to be raised from the sale of certain bonds,
and agreed that he would not charge for the plans unless the
bonds were sold and a contractor obtained who would build the
house for $16,000.  Appellant further alleged in its answer
that the bond issue was illegal and that no responsible con-
tractor could be found who would build the house for $16,000.
It was proved that the bonds that had been voted were invalid
and could not be sold.  The appellant therefore had no funds
from the sale of bonds with which to pay Phelps' claim.
The opinion refers to Art. 2839 (R.C.S. 1911), which provided
that when such bonds have been voted for, they shall be

examined by the Attorney General and registered by the Comptroller of Public Accounts, and, when sold to the highest bidder, the purchase money shall be placed in the County Treasury to the credit of the school district.  The opinion then sets forth the purposes as specified in said article, for which the money should be used, viz: "in payment of accounts legally contracted in buying, building, equipping, or repairing the schoolhouse, or schoolhouses for such district, or in the purchase of sites therefor."  Then follows this important statement in said opinion:

"It is clearly contemplated in the law cited that the contracts shall be made after the bonds shall have been issued and sold, and that the money arising from such sale shall be disbursed only to satisfy and meet such contracts."  (Emphasis ours)

After providing that such bonds shall be examined by the Attorney General, and if approved, registered by the Comptroller, our present statute, Article 2786, R.C.S. 1925, as amended, provides:

"All bonds shall be sold to the highest bidder for not less than their par value and accrued interest, and the proceeds of such sale shall be deposited in the County depository for the common school districts, and in the district depository for the independent school districts, to the credit of such districts, and shall be disbursed only for the purpose for which said bonds were issued, . . ."

The purposes for which said bonds can be issued are "for the purchase, construction, repair or equipment of public free school buildings within the limits of such districts (common and independent) and the purchase of the necessary sites therefor."  Art. 2784e, Vernon's Annotated Civil Statutes.  (Parenthetical insertion ours)

The Alpine School District case hereinabove discussed further held that the expense of plans and specifications are necessary in building a schoolhouse, and could be paid for out of money arising from the sale of schoolhouse bonds.  Such bond money, however, would have to be in the hands of the trustees at the time the plans and specifications were contracted for.

The case of Bone v. Black, et al, 174 S.W. 971 (Civ. App., Amarillo), held that a school board cannot contract for a building after the bonds therefor are issued but prior to their sale, citing the Alpine Independent School District case, supra. The following quotation from the Bone v. Black case is very enlightening:

"Article 2842 (R.C.S.1911, the corresponding article now being 2787, R.C.S.1925) indicates that until the bonds are sold the taxes levied to pay them may be discontinued by vote. If before they are sold the tax should be discontinued, the bond will be valueless. Hence a contract before they are sold does not bind the fund. There is no power in the trustees to give bonds for the building. They must be sold, and the money placed in the treasury, and drawn out upon the proper order. The trustees have no power or authority over these bonds until they are sold. No discretion is vested in them when they shall contract. It must be done when the money is in the treasury for that purpose, or is available; otherwise, they can create no obligation against the district. We think it is a general rule 'that such contract can be entered into, only to the extent of funds provided and available for that purpose,' by trustees." (Parenthetical insertion ours)

The case of Harlingen Independent School District v. Page & Bro., 48 S.W. (2d) 983, was rendered by the Commission of Appeals of Texas, Section A, in 1932. After referring to the pertinent statutes of the 1925 codification, with then existing amendments, Judge Critz discussed with approval the cases of Alpine School District and Bone v. Black, above referred to, and quoted at some length from the latter case. We now quote from the concluding portion of Judge Critz's opinion:

"All of the statutes which confer power to expend bond funds limit the power to funds that are available, and from all of the statutes and constitutional provisions above mentioned, we are compelled to the conclusion that it was not the intention of the Legislature to permit the board (of school trustees) to contract with reference to such funds unless and until they are actually available, . . ." (Underscoring and parenthetical insertion ours)

In the rather recent case of City of Big Spring v. Ward, 169 S.W. (2d) 151, by the Commission of Appeals of Texas, Section A, adopted by the Supreme Court on March 3, 1943, Judge Brewster cited and quoted from the Harlingen Independent School District case hereinabove referred to.  The Big Spring case involved a city instead of a school district; nevertheless, the same principle of law applied concerning contracts to expend bond money before such money became available.  In said case Judge Brewster held:

"In the case at bar the city had no power to make the contract (for constructing proposed improvements) when it attempted to do so, because it then had no money on hand with which to construct the contemplated improvements and none available for that purpose." (Parenthetical insertion ours)

Section 53 of Article 3 of our State Constitution provides:

"The Legislature shall have no power to grant, or to authorize any county or municipal authority to grant, . . . ; nor pay, nor authorize the payment of, any claim created against any county or municipality of the State, under any agreement or contracts, made without authority of law."

Independent school districts in Texas are municipalities with the powers conferred on them by law.  Harlingen Independent School District v. Page & Bro., supra.  The Borger Independent School District, being a municipality, was without authority of law to make any contract concerning the expenditure of bond money until such money was available.  Such money could only become available by the bonds being approved, registered, sold, and the proceeds deposited, all in accordance with the provisions of Article 2786, Revised Civil Statutes, 1925, as amended, supra.  Since none of these requirements have been met, any contract or contracts heretofore made by said Borger District were ultra vires and without authority of law. Hence, our conclusions are as hereinabove announced.

Yours very truly

LHF:EP:bt
APPROVED Nov. 7,1945
Carlos C. Ashley
First Assistant Attorney
    General
Encl.
APPROVED Opinion Committee
BWB, Chairman

Attorney General of Texas

By:s/L.H. Flewellen
    L.H. Flewellen
        Assistant